**UNITED STATES of America, Plaintiff,**

v.

**Jack PAYNER, Defendant.**

**No. CR76–305.**

United States District Court,
N. D. Ohio, E. D.

April 28, 1977.

Bernard S. Bailor, Dora A. Sahuruni, John F. Hyland, Sp. Attys., Washington, D. C., for plaintiff.

Bennet Kleinman, Bernard Stuplinski, Cleveland, Ohio, for defendant.

## MEMORANDUM OF OPINION
## MOTION TO SUPPRESS

MANOS, District Judge.

On September 14, 1976 the defendant Jack Payner was indicted for knowingly and willfully making a false statement in a matter within the jurisdiction of an agency of the United States in violation of 18 U.S.C. § 1001. Specifically, the Government charged Payner with falsely stating on his 1972 Federal Income Tax Return that he did not have a foreign bank account when in fact he had an account of over

$100,000 in the Castle Bank of the Bahamas.[1]

On January 6, 1977, the defendant filed a motion to suppress all evidence obtained by the Government from allegedly illegal searches conducted by government agents during January of 1973. In response the Government argued that the evidence it intended to introduce against Payner was neither the direct product, nor the fruit of the allegedly unconstitutional searches, but was evidence obtained from sources independent of the searches in issue. Also, the Government argued that even if the evidence against Payner was obtained from information arising out of the January, 1973 searches, the evidence should not be suppressed because Jack Payner has no standing to raise the issue of the constitutionality of the searches. On March 14, 1977, by agreement of the parties, the Court proceeded to try the defendant on the merits of the indictment together with the motion to suppress.[2] This opinion deals only with the issues raised by the motion to suppress.

## I.

### FINDINGS OF FACT

#### A. The seizures of January, 1973.

In 1965 the Internal Revenue Service initiated Operation Trade Winds for the purpose of gathering information about the financial activities of American citizens in the Bahamas.[3] Special Agent Richard Jaffe of the Jacksonville, Florida Office of the Internal Revenue Service (IRS) supervised the investigation.[4] IRS agents gathered information pertinent to Operation Trade Winds by making numerous trips to the Bahamas and by the use of over 30 informants.[5]

In June, 1972 the IRS suspected that the Castle Bank and Trust Company of the Bahamas functioned as an illegal tax haven for American taxpayers.[6] The IRS' suspicion was based on information about an alleged California narcotics dealer, Allan Palmer, who deposited a check in his bank account originally drawn on the Castle Bank of the Bahamas. Further investigation revealed that the Castle Bank had an account with the Bank of Perrine in Florida, and that Palmer had $25,000 in a Castle Bank account which he opened through the assistance of the Bank of Perrine.[7] In August, 1972 representatives of the IRS districts in San Francisco, Chicago, Miami, and Pittsburgh met in Jacksonville, Florida to discuss the involvement of the Castle Bank with respect to narcotic trafficking investigations pending in each district.[8]

In late October, 1972, Special Agent Jaffe met with one of his informants, Norman Casper, and asked him to obtain the names and addresses of the individuals holding accounts with the Castle Bank.[9] In the first week of November of 1972 Casper decided to secure the requested information[10] and in late November of 1972, as part of the scheme to get the names of the Castle Bank depositors, Casper introduced Sybol Kennedy to Michael Wolstencroft.[11] Wolstencroft was then an

---

1. The question which Payner allegedly answered falsely read as follows:

 "Did you, at any time during the taxable year, have any interest in or signature or other authority over a bank, securities or other financial account in a foreign country (except in a U.S. military banking facility operated by a U.S. financial institution)?" See, Exhibit 1.

2. The defendant waived his right to trial by jury. See, Jury Waiver Form. The Court consolidated the trial on the merits with consideration of the motion to suppress because it was necessary to know whether the Government's evidence was obtained from a source or sources independent of the search. See F.R. Crim.P. 12(e).

3. See, Transcript of the Motion to Suppress [TRM] 9–10.

4. TRM 24.

5. TRM 133–135.

6. TRM 138.

7. TRM 5. See also footnote 55 infra.

8. TRM 61.

9. TRM 80–81.

10. TRM 81.

11. TRM 89.

acquaintance of Casper's [12] and Vice-President and Trust Officer of Castle Bank. Sybol Kennedy was a private detective employed by Casper.[13] At the time Casper introduced Wolstencroft to Sybol Kennedy, Casper knew that Wolstencroft frequently traveled to the United States carrying a briefcase containing documents concerning the operation of the Castle Bank.[14] In early January, 1973 Casper learned that Wolstencroft planned a business trip to the United States on January 15, 1973, and would have records of the Castle Bank in his possession during the trip.[15]

In the week preceding January 15, 1973 Casper and Special Agent Jäffe discussed a covert plan to intercept copies of the documents that Wolstencroft planned to bring into the United States. On Tuesday, January 9, 1973 Casper told Jaffe that he could get the documents from Wolstencroft but that he needed Jaffe to supply photographic services,[16] and on Thursday, January 11, 1973 Casper outlined to Jaffe his plan to get the documents from Wolstencroft.[17] Casper specifically told Jaffe that he planned to enter an apartment from which he expected to remove Wolstencroft's briefcase.[18] Jaffe told Casper that he would have to clear such an operation with his superior, Troy Register, Jr., Chief of the IRS Intelligence Division in Jacksonville.[19] After obtaining authorization from Register, Jaffe told Casper to proceed with the operation. On Friday, January 12 Casper phoned Jaffe and asked if the IRS could refer him to a locksmith who could be "trusted," [20] which Jaffe did.[21]

On January 15, 1973 Wolstencroft arrived in the United States and went to Sybol Kennedy's apartment. What occurred at her apartment, if anything, was not brought out at trial.[22] However, at 7:30 p. m. Sybol Kennedy and Wolstencroft left Kennedy's apartment to go to a restaurant on Key Biscayne, whereupon Casper entered the apartment with a key given him by Kennedy, and removed Wolstencroft's briefcase without permission.[23] Casper took the briefcase to a locksmith who had been recommended by the IRS, and who had previously refused to enter the apart-

12. Transcript [Tr.] 286.

13. TRM 88.

14. TRM 91.

15. TRM 84. On January 11, 1973 when Casper informed Jaffe of his plan, he simply advised Jaffe that he expected to obtain information from an apartment. Casper did not say that he had permission to enter the apartment or to take the briefcase containing Castle Bank information from the apartment. TRM 105–108. Contrast Jaffe's rendition of the events on the Thursday prior to the taking of the briefcase, at TRM 155, 172. The Court disbelieves Jaffe's assertion that Casper told him on January 11, 1973 that he received a key from the owner of the apartment from which he expected to obtain the information. *See also*, fn. 40, *infra*.

16. TRM 87, 105, 146–147.

17. TRM 105.

18. TRM 105–106, 155.

19. TRM 108, 155. *See also*, fn. 40, *infra*.

20. The following testimony was given by Casper regarding the need for a locksmith who could be trusted:

"Q. Isn't it a fact, Mr. Casper, you knew you were committing an illegal act, and you wanted somebody who could be trusted to keep his mouth shut about it?
"A. There is that possibility, yes.
"Q. Isn't that the fact.
"A. Yes." TRM 112–113. *See also*, TRM 149–150.

21. TRM 149–150.

22. Although testimony from Sybol Kennedy would have been very helpful to the Court in resolving the factual issue of the propriety or impropriety of the Government's conduct, with respect to Wolstencroft, counsel for the Government never called her as a witness, and the record fails to indicate that she was unavailable. It appears to the Court that it is peculiarly within the power of the Government to produce her, since she worked for its agent and she is totally unknown to the defendant. Therefore, the Court infers from her unexplained failure to testify that her testimony would be unfavorable to the Government by further delineating the improprieties of what Casper himself characterized as the "briefcase caper." *See*, TRM 117.

23. TRM 95.

ment with him. Casper met the locksmith in a parking lot five blocks from Kennedy's apartment and instructed him to make a key for the briefcase.[24] Casper then took the briefcase to an IRS agent's private residence, selected by Jaffe as the rendezvous point, and opened it in Jaffe's presence. Over 400 documents were taken out of the briefcase and photographed.[25]

Jaffe, Casper, and an IRS photography expert used two cameras to photograph the documents, a "normal" camera and a microfilm camera.[26] The microfilm camera was used because it was faster[27] than a normal camera, and Agent Jaffe knew that the briefcase had to be returned to Sybol Kennedy's apartment before she and Wolstencroft got back from dinner.[28] To get the briefcase back timely Casper had Kennedy and Wolstencroft watched during their dinner. When Kennedy and Wolstencroft completed their dinner,[29] Casper's lookout[30] phoned him at the residence which the IRS used to photograph the documents. After all documents were copied, Casper closed the briefcase, accidentally broke off the key in the lock,[31] and returned the documents to

Kennedy's apartment at approximately 9:00 p. m.

Within the next two weeks Jaffe again met with Casper and told him that additional information concerning Castle Bank's customers was needed.[32] Casper obtained the requested additional information by sending Sybol Kennedy to the Bahamas to visit Wolstencroft. While there she stole a rolodex file from his office as Casper directed her to do.[33] The stolen rolodex file was then turned over to Jaffe, who expressed no concern over the methods used to obtain it.[34]

Casper was paid $8,000 in cash by the IRS for obtaining the information relating to Castle Bank.[35] Sybol Kennedy was paid approximately $1,000 by Casper from funds he received from the IRS for her part in obtaining the briefcase and the rolodex.[36]

This Court finds that the United States, through its agents, Richard Jaffe, and others, knowingly and willfully participated in the unlawful seizure of Michael Wolstencroft's briefcase,[37] and encouraged its informant, Norman Casper, to arrange the theft

---

**24.** TRM 96. *See also,* TRM 111.

**25.** TRM 97, 154, 157. Jaffe selected the home of an IRS agent which was located eight blocks away from where Casper met the locksmith. TRM 96. Jaffe selected this location because he knew that Casper needed to hurry and it was located close to the apartment from which the documents were purloined. TRM 155–157. For the number of documents photographed, *see,* TRM 130.

**26.** TRM 148–149, 154.

**27.** Jaffe was asked, "What was the necessity for your being hurried?" He replied, "Mr. Casper had to get the documents and the briefcase back to the apartment prior to the return of the owner." TRM 154–155.

**28.** TRM 154.

**29.** TRM 158.

**30.** Jaffe in answer to a question stated, "I don't know who the person was, but he [Casper] had arranged for somebody to observe the lady who owned the apartment and her date, and let them know when they were finished eating dinner, to give him some idea when they would be returning." Tr. 158.

**31.** TRM 98–99, 157–158, 174–177.

**32.** TRM 118, 126–129, 160.

**33.** TRM 117–118.

**34.** Jaffe was asked by defense counsel, "Did you care how he obtained it?" and he answered, "I don't recall thinking that at the time, no sir." Defense counsel then asked, ". . . all you wanted was the information, and you did not care how it was obtained?" To which Jaffe responded, "Well, I certainly didn't expect him to murder anybody for it." TRM 161. Casper testified that when he handed Jaffe the rolodex file stolen from Wolstencroft's desk Jaffe "was rather elated." TRM 119.

**35.** TRM 116.

**36.** TRM 115, 123.

**37.** It is important to note that the seizure was conducted in order to obtain information about depositors in Castle Bank; it was not to gain information about Wolstencroft. Jaffe was asked, "So you had no interest in taking action against Mr. Wolstencroft." He answered, "Yes, sir." TRM 165.

of a rolodex from the offices of Castle Bank.[38] The Court does not accept the Government's argument that Casper was an independent contractor who acted alone, without the knowledge and concurrence of Jaffe.[39] Jaffe knew that Casper had hired Kennedy to date Wolstencroft, knew that Wolstencroft's briefcase would be taken without permission, furnished the name of a locksmith who could be "trusted," knew that the locksmith was hired to break into the briefcase, and knew that he and another IRS agent had to copy the documents in a hurry in order to get the briefcase back to the apartment before Wolstencroft's return.

That the proposed activity was unusual and that Jaffe knew it was unusual was demonstrated by his clearing the scheme with his superior.[40] The Court concludes that the United States was an active participant in the admittedly criminal conduct in which Casper engaged in order to procure

**38.** This conclusion is reached by weighing the demeanor and reliability of each witness who testified and then accepting all, part, or none of what the witness has asserted. *See, United States v. Gargotto,* 510 F.2d 409, 411, fn. 1.(6th Cir., 1974).

**39.** TRM 145.

**40.** Jaffe testified, "Whatever I knew, he [Register] knew." TRM 172–173. See also, Casper's responses to questions put to him by defense counsel at TRM 106–110.

"Q. Did you testify, Mr. Casper, before the hearings of the Rosenthal Committee?

"A. Yes.

"Q. And were you under oath when you testified?

"A. Yes.

"Q. Do you recall making these statements: 'I think that the memorandum was January, 1973. The memo said in effect a banker coming through would be coming through the Miami area and there might be some provision that I might have a way of obtaining the information that Mr. Jaffe and I had previously discussed.

'Now, approximately two days prior to this it really began to jell as to what I might be able to do, and I did something which was inadvertent, and that was that I told Mr. Jaffe that I would be entering an apartment and taking the briefcase out at the time.'

Do you remember that?

"A. Yes, I do.

"Q. Do you remember further on testifying then that:

'After Mr. Jaffe told me that he had been in touch with his immediate supervisor or superior, and I assumed that to be Troy Register, and I asked him about it, and he said yes, and it has been cleared.'

Do you remember making that statement?

"A. Yes.

"Q. What was cleared?

"A. To the best of my knowledge, that it was permissible to go into the apartment and get a briefcase.

". . . .

"Q. Had he asked you how you were going to get into the apartment, Mr. Casper?

"A. At that time, no.

"Q. And you didn't tell him how you were going to get into the apartment?

"A. To the best of my recollection, no.

". . . .

"Mr. Casper, you have indicated that what you stated in the Rosenthal hearings was correct, that Mr. Jaffe told you, 'Yes,' and, 'It has been cleared.' Is that correct?

"A. Yes.

"Q. Did he tell you what had been cleared?

"A. No.

"Q. Did you ask him what had been cleared?

"A. No.

"Q. Did you ask him to get something cleared?

"A. No.

"Q. Do you remember testifying in this manner, Mr. Casper? You were asked by Mr. Moffitt:

'Q. What was inadvertent about your statement?

'A. I blurted it out. He didn't need to know about this. All I am going to do is supply information. I kind of kicked the bucket anyway, but that was his reaction to this, because immediately he drew up the warning flag, the red flag, and wanted to get clearance on this obviously before anything was done.'

". . . .

"Q. You said he drew up the warning flag, the red flag. You stated that, did you not?

"A. Yes, I did.

"Q. What did you mean by that when you made that statement?

"A. Mr. Jaffe at that time said to me, 'I have to get clearance.'

". . . .

"Q. Did he tell you what he had to get clearance about?

"A. No.

"Q. Nor did you inquire?

"A. No.

"Q. And before he got the clearance, you didn't do anything; is that correct?

"A. That is correct." See also footnote 20 supra.

the Castle Bank's documents in January of 1973.

### B. The Payner Investigation.

In late 1971 and continuing through the early part of 1972 the Internal Revenue Service investigated the financial dealings of an alleged narcotics trafficker, Allen Palmer.[41] Through their investigation of Palmer they discovered a connection between the Bank of Perrine, located in Perrine, Florida, and the Castle Bank and Trust Co.[42]

On January 15, 1973 documents indicating that Jack Payner held a bank account with Castle Bank and Trust Co. were taken from Michael Wolstencroft's briefcase and duplicated by the Government.[43] These same documents also indicated that the Perrine Bank was linked to the Castle Bank.[44] Within the next two weeks a rolodex was taken from the offices of the Castle Bank. The rolodex contained the name and address of Jack Payner.[45] On February 22, 1973 the Internal Revenue Service sent a letter to Jack Payner advising him that his 1968, 1969, 1970 and 1971 tax returns were being investigated.[46] On April 9, 1974 the investigation of Payner's 1968–1971 income tax returns was completed and his tax returns for those years were accepted as filed.[47] During April and May of 1974 subpoenas were issued to the Bank of Perrine requiring the production of all documents concerning Perrine's dealings with Castle Bank.[48] One of these subpoenas[49] uncovered a guarantee agreement, Exhibit 4, which pledged money in a Castle Bank account in the name of Jack Payner as security for a $100,000 loan by Castle Bank to Conel Development Inc. This guarantee was forwarded to the Cleveland Office of the IRS[50] and generated an IRS investigation of Jack Payner's 1972 tax return.[51] That investigation, commenced on October 10, 1974, led to the return of this indictment against the defendant.

The initial issue presented is whether the Government met its burden of proof to show that Exhibit 4 was not the fruit of the January 15, 1973 seizure. The Court finds that the Government did not meet its burden to show that Exhibit 4 was the product of an investigation *independent* of the information taken from Wolstencroft's briefcase.

Special Agent Richard Jaffe was asked the following question, "Mr. Jaffe, do you know if the subpoena to the Bank of Perrine in 1974 was issued because of what was found in the briefcase." He answered, "I don't believe so."[52] This Court, viewing Richard Jaffe's testimony as a whole, including his demeanor while presenting his testimony, finds that Jaffe's testimony on this point was *unconvincing*. Jaffe admitted telling a committee of the United States Congress, under oath, "It [the briefcase] provided the leads as to where to serve the Grand Jury subpoenas."[53] Jaffe also admitted having said, "The information obtained from the informant was extremely valuable and was unavailable from any other source."[54] Further, the chronology of the events that led to the subpoena casts doubt upon Jaffe's assertion of the independent source of the subpoena. If the Allan Palmer investigation was the reason for the

41. TRM 3–4.

42. TRM 5. See footnote 55 *infra*.

43. TRM 26–27, 31.

44. TRM 33.

45. TRM 44.

46. Tr. 221–222, 225.

47. Tr. 232–233, and Exhibit D.

48. TRM 19–20.

49. The Government introduced Exhibit 300 as being the subpoena that produced Exhibit 4. However, the Government's witnesses were unable to confirm this. *See*, TRM 20.

50. TRM 36.

51. TRM 18–19, 56.

52. TRM 22. *See also*, TRM 34.

53. TRM 33–34.

54. TRM 33–34.

Perrine Bank subpoena, which produced Exhibit 4, why wasn't that subpoena issued in 1972? This Court finds that it was not coincidence that the Perrine Bank was served with subpoenas shortly after the information in the briefcase had been examined and discussed throughout the IRS districts in the United States.[55]

The Court finds that the briefcase seized on January 15, 1973 provided the leads which resulted in the issuance of subpoenas to the Bank of Perrine in April and May, 1974. Further the Court finds that Exhibit 4 is a product of the seizure of January 15, 1973, and that the subsequent investigation and indictment of Jack Payner stemmed from the January 15, 1973 seizure.

## II.

## CONCLUSIONS OF LAW

The sole question of law presented is whether relevant evidence, accumulated as a result of the information found in Wolstencroft's briefcase, must be excluded from consideration of the Government's case against Jack Payner.[56] The defense argues that the seizure of the briefcase was illegal and unconstitutional, and that any evidence

which is the product of that seizure must be excluded. The United States argues that Payner has no standing under the Fourth Amendment to assert the alleged unconstitutionality of the seizure of the briefcase; that the seizure is not so heinous as to require exclusion of the evidence under the Due Process clause of the Fifth Amendment; and that the Court should not use its supervisory power over federal prosecutions as a basis for excluding the evidence.

### The Exclusionary Rule

■ American jurisprudence recognizes numerous examples in which relevant, and otherwise admissible evidence is excluded from consideration in criminal prosecutions because of the procedure the Government used to obtain it.

■ The reasoning in support of the "exclusionary rule" is twofold. The *first* is the necessity to deter law enforcement officers from using illegal and unconstitutional procedures to obtain evidence of a crime. *See, e. g., Elkins v. United States*, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Calandra*, 414 U.S. 338, 347–348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Peltier*, 422 U.S. 531, 537–

---

**55.** TRM 164–170. See also footnote 69 *infra.* This court specifically finds that the investigation of Allen Palmer produced information concerning a connection between the Castle Bank and the Bank of Perrine. The Palmer investigation, along with Casper's comment to Jaffe in June of 1972 that he (Casper) had once seen what might be a list of the Castle Bank clients, sharply intensified the I.R.S. interest in the Castle Bank. TRM 137–145. However, the Court finds that this information was insufficient to issue a subpoena to the Perrine Bank in 1972, and, for that obvious reason, the I.R.S. issued no such subpoena at that time. See, F.R.Crim.P. 17(c); · *United States v. Mitchell et al.,* 377 F.Supp. 1326, 1329–1330 (D.D.C., 1974), *aff'd in United States v. Nixon et al.,* 418 U.S. 683, 698–703, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) ["Good cause" required for issuance of a subpoena]. The interest generated by this information caused the August, 1972 meeting of representatives from four regional IRS districts, at which further intelligence gathering plans were made. TRM 144, 62–63, 80–81. However, the IRS still had insufficient data with which to obtain a subpoena from the Perrine Bank at the time of the August, 1972

meeting and therefore in late October, 1972, Jaffe asked Casper to obtain the names and addresses of individuals holding accounts with the Castle Bank. TRM 81. After October, 1972, Casper and Jaffe concocted the briefcase scheme which ultimately furnished the information used to issue the April or May, 1974 subpoena on the Perrine Bank.

**56.** This Court shall not deal with the seizure of the rolodex. There is no evidence that the information contained on the rolodex has been used by the Government in any way in the presentation of its case against Jack Payner. As was made clear in the Court's Findings of Fact, it was the briefcase material that led to the subpoenas on the Bank of Perrine and thereby the discovery of Exhibit 4, the guarantee. *It is the exclusion of the guarantee as the fruit of the unlawful seizure which is the gravamen of the defendant's motion to suppress.* The rolodex was not shown to play any part in uncovering the guarantee, since there was no evidence that the rolodex contained information showing a connection between the Castle Bank and the Bank of Perrine. *See TRM 31.*

538, 95 S.Ct. 2313, 2317, 45 L.Ed.2d 374 (1975); *United States v. Janis*, 428 U.S. 433, 457, 96 S.Ct. 3021, 3034, 49 L.Ed.2d 1046 (1976).

Thus, the Supreme Court wrote:

"The rule is calculated to prevent, not repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it." *Elkins, supra*, 364 U.S., at 217, 80 S.Ct., at 1444.

The *second* reason for invoking the "exclusionary rule" is to maintain the integrity of the judicial process. *See, e. g., Elkins v. United States, supra*, 364 U.S., at 222, 80 S.Ct. 1437; *Mapp v. Ohio*, 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Brown v. Illinois*, 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975). As the Supreme Court stated in *Mapp* :

"The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the character of its own existence." *Mapp, supra*, 367 U.S., at 659, 81 S.Ct., at 1694.

■ Although the exclusion of wrongfully gathered evidence preserves important social interests, judicial suppression of relevant and reliable evidence is never ordered lightly [57] because society has important and substantial interests which *require* the admission of all relevant and reliable evidence in a criminal prosecution. *See, e. g., Bivens v. Six Unknown Fed. Narcotics Agents*, 403

U.S. 388, 411, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Burger, C. J., dissenting); *United States v. Janis*, 428 U.S. 433, 447, 96 S.Ct. 3021, 3029, 49 L.Ed.2d 1046 (1976); *Brewer v. Williams*, 430 U.S. 387, 421, 97 S.Ct. 1232, 1250, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting). The most notable social interest which favors admission of evidence is the concept that the trier of fact performs a truth-seeking function for both society [58] and the accused. The truth seeker can perform its essential social function of issuing accurate adjudications of factual guilt or innocence only if the law insures the presentation of the fullest range of relevant evidence to the trier of the facts.[59] *See, Brewer v. Williams*, 430 U.S. 387, 422, 97 S.Ct. 1232, 1251, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting).

■ The decision whether or not to use the heavy hand of the exclusionary rule is determined by weighing the social interest in ascertaining accurately a particular defendant's factual guilt against the inconsistent competing social interest of deterring government officials from getting evidence in a manner that violates the Constitution. In *United States v. Janis, supra*, 428 U.S., at 454, 96 S.Ct., at 3032, the Supreme Court stated that the exclusionary rule is to be invoked when the evidence shows "a sufficient likelihood of deterring the [unlawful] conduct of the state [federal] police so that it [the social benefit of exclusion] outweighs societal costs imposed by exclusion." *See also, Michigan v. Tucker*, 417 U.S. 433, 450–451, 94 S.Ct. 2357, 41

---

**57.** The result of the use of the exclusionary doctrine is often as Justice Cardozo puts it that "[t]he criminal is to go free because the Constable has blundered." *People v. DeFore*, 242 N.Y. 13 at 21, 150 N.E. 585 at 587.

**58.** It must be remembered that society has a considerable interest in the effective prosecution of criminals. *See, Michigan v. Tucker*, 417 U.S. 433, 451, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974). As the Supreme Court stated in *Nardone v. United States* :

"Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Con-

stitution or the law of the land. In a problem such as that before us now, two opposing concerns must be harmonized: on the one hand, the stern enforcement of the criminal law; on the other, protection of the realm of privacy left free by Constitution and laws but capable of infringement either through zeal or design." *Nardone v. United States*, 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

**59.** Chief Justice Burger states, "In evaluating the exclusionary rule, it is important to bear in mind exactly what the rule accomplishes. Its function is simple—the exclusion of truth from the fact finding process." *Stone v. Powell*, 428 U.S. 465, 496, 96 S.Ct. 3037, 3053, 49 L.Ed.2d 1067 (1976) (C. J. Burger, concurring).

L.Ed.2d 182 (1974); *Brown v. Illinois*, 422 U.S. 590, 610–611, 95 S.Ct. 2254, 2264–2265, 45 L.Ed.2d 416 (1975) (Concurring Opinion of J. Powell); *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1975); *United States v. Peltier*, 422 U.S. 531, 537–538, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975); *United States v. Martinez-Fuerte*, 428 U.S. 543, 554–567, 96 S.Ct. 3074, 3081–3087, 49 L.Ed.2d 1116 (1976); *United States v. Perez*, fn. 33 (N.D.Ohio, April 21, 1977). Recently the Sixth Circuit stated:

"The Supreme Court, however, has not proscribed the use of illegally seized evidence against all persons or in all proceedings. Rather, it has determined that there must in effect be a balancing of the benefits to defendants other than the victim of the search or seizure by containing police activities within the letter of the law against the encroachment upon the public interest in having defendants acquitted or convicted on the basis of all the evidence which exposes the truth, in deciding whether the exclusionary rule has application, and, a fortiori, whether standing to invoke the rule exists." *United States v. Hunter*, 550 F.2d 1066, p. 1074 (6th Cir., 1977, No. 76–1631).

The Supreme Court points to three separate situations in which the balance of competing interests may justify the exclusion of reliable, probative evidence.[60]

 *First*, the High Court firmly established the constitutional principle that evidence obtained by the Government in violation of the Fourth Amendment right to be free of unreasonable searches and seizures shall be excluded from consideration against the person whose privacy interest has been invaded. *See, e. g., Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). *Second*, the Supreme

Court also established the constitutional principle that the Government violates the Due Process rights of an individual who is the target of a search procedure which is so *outrageous* that it shocks a court's conscience. Evidence obtained by such outrageous Due Process violations must be excluded. *See, Rochin v. California*, 342 U.S. 165, 169–174, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *Jackson v. Denno*, 378 U.S. 368, 385–386, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Lego v. Twomey*, 404 U.S. 477, 485–486, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). *Third*, federal courts sustain supervisory power to exclude evidence which the Government obtained in a manner so inconsistent with American standards of justice that to allow admission of the evidence calls into question the integrity of the entire federal judicial system. *See, McNabb v. United States*, 318 U.S. 332, 340–344, 63 S.Ct. 608, 87 L.Ed. 819 (1943); *Elkins v. United States*, 364 U.S. 206, 216–223, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Valencia*, 541 F.2d 618, 621–622 (6th Cir. 1976).

This Court must analyze the facts of Payner's case and determine the admissibility, against him, of the materials derived from the briefcase by applying the balance of interest test appropriate to each of the three different legal theories under which evidence may be excluded.

### The Fourth Amendment

 In order for a court to suppress material under the Fourth Amendment, the evidence in question must be: (1) the product of an unconstitutional search or seizure, *see, e. g., Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914); (2) obtained in a search conducted by the Government, *see, e. g., Burdeau v. McDowell*, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); and (3) seized from a party who has standing to assert the unlawful-

---

**60.** There are a number of other areas in which courts have excluded evidence. For example, *see, Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) [Fifth Amendment right to remain silent]; *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) [Sixth Amendment].

ness of the search and seizure, i. e., the movant must be the person whose privacy interests were violated, *see, e. g., Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). In this case the Government admits that the search and seizure of Wolstencroft's briefcase violated his Fourth Amendment rights, and this Court expressly finds that the search was conducted at the Government's behest and with its concurrence. However, Jack Payner possessed no privacy interest in the Castle Bank documents that were seized from Wolstencroft. *See, e. g., California Bankers Association v. Shultz*, 416 U.S. 21, 49, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974); *United States v. Miller*, 425 U.S. 435, 440–441, 96 S.Ct. 1619, 1622–1623, 48 L.Ed.2d 71 (1976); *Couch v. United States*, 409 U.S. 322, 335–336, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973). Therefore Payner has no standing under the Fourth Amendment to raise the illegality of the seizure of Wolstencroft's briefcase. As the Supreme Court stated:

"The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." *Alderman v. United States*, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).

*See, e. g., Jones v. United States*, 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Brown v. United States*, 411 U.S. 223, 229–230, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); *United States v. Hunter et al.*, 550 F.2d 1066, 1072, Case No. 76–1631 (6th Cir., 1977).[61]

**61.** It has been argued that the Supreme Court in *Jones v. United States, supra* and *Alderman v. United States, supra* did not intend to preclude an accused *who was the target* of an illegal search but who, as here, was not the person who was actually searched, from having standing to raise the Fourth Amendment exclusionary rule. *See, United States v. Lisk*, 522 F.2d 228, 231 (7th Cir., 1975) (Swygert, concurring); *United States v. Alewett*, 532 F.2d 1165, 1167 (7th Cir., 1976); *United States v. Roger S. Baskes*, —— F.Supp. ——, Case No. 76CR585 (N.D.Ill., March 23, 1977). This Court is con-

[12] The standing requirement of the Fourth Amendment demonstrates the Supreme Court's use of the *Janis, supra*, balancing test. The Court has decided that the police must be deterred from violating the central interest that the Fourth Amendment protects, an individual's expectation of privacy, when asserted personally. *United States v. Dionisio*, 410 U.S. 1, 8–9, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). However, when an expectation of privacy is asserted vicariously, the Court has found the deterrent interest served by exclusion less substantial and has struck a balance in favor of society's truth-seeking interest by allowing admittedly unconstitutionally gathered material into evidence. As the Supreme Court stated in *Alderman*:

"The deterrent values of preventing the incrimination of those whose rights the police have violated have been considered sufficient to justify the suppression of probative evidence even though the case against the defendant is weakened or destroyed. We adhere to that judgment. But we are not convinced that the additional benefits of extending the exclusionary rule to other defendants would justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Alderman, supra*, 394 U.S., at 174–175, 89 S.Ct., at 967. *See also, Brewer v. Williams*, 430 U.S. 387, 421, 97 S.Ct. 1232, 1251, fn. 4, 51 L.Ed.2d 424 (1977) (Burger, C. J., dissenting).

### The Fifth Amendment

■ The Supreme Court has long recognized the principle that all criminal prosecu-

vinced from its reading of *Jones, Alderman*, and *Mancusi v. DeForte*, 392 U.S. 364, 367–372, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), as well as the more recent Supreme Court decisions of *United States v. Miller*, 425 U.S. 435, 440–443, 96 S.Ct. 1619, 1622–1624, 48 L.Ed.2d 71 (1976), and *California Bankers Association v. Shultz*, 416 U.S. 21, 41, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974), that only a party whose expectation of privacy has been violated may raise the unconstitutionality of a search and seizure under the Fourth Amendment.

tions must meet the bare minimum requirements of Due Process of law. What this entails is best explained by reference to the words of Justice Frankfurter in *Rochin v. California*:

"Regard for the requirements of Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings [resulting in a conviction] in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English speaking peoples even toward those charged with the most heinous offenses.' These standards of justice are not authoritatively formulated anywhere as though they were specifics. Due process of law is a summarized constitutional guarantee of respect for those personal immunities which, as Mr. Justice Cardozo twice wrote for the Court, are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental', or are 'implicit in the concept of ordered liberty'.
" . . . .

"Restraints on our jurisdiction are self-imposed only in the sense that there is from our decisions no immediate appeal short of impeachment or constitutional amendment. But that does not make due process of law a matter of judicial caprice. The faculties of the Due Process Clause may be indefinite and vague, but the mode of their ascertainment is not self-willed. In each case "due process of law" requires an evaluation based on a disinterested inquiry pursued in the spirit of science, on a balanced order of facts, exactly and fairly stated, on the detached consideration of conflicting claims, on a judgment not *ad hoc* and episodic but duly mindful of reconciling the needs both of continuity and of change in a progressive society." *Rochin v. California*, 342 U.S. 165, 169 and 172, 72 S.Ct. 205, 208 and 209, 96 L.Ed. 183 (1952) [citations omitted].

In *Rochin* the defendant was charged and convicted of possession of morphine by the State of California. The key evidence against the defendant were two capsules of morphine, which the police had extracted from the defendant by force and against his will by using a "stomach pump." In overturning the conviction as violating Due Process, the court stated:

" . . . We are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceedings by agents of government to obtain evidence is bound to offend even hardened sensibilities." *Rochin v. California, supra,* 342 U.S., at 172, 72 S.Ct., at 209.

In a number of other cases the Supreme Court has likewise excluded relevant evidence because the procedures used to obtain it violated Due Process. In *Jackson v. Denno,* 378 U.S. 368, 386, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the Supreme Court approved the exclusion of involuntary confessions stating:

"because of 'the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.' " *Id.* at 386, 84 S.Ct. at 1785 [citations omitted]. *See also, Lego v. Twomey,* 404 U.S. 477, 485, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Brown v. Mississippi,* 297 U.S. 278, 286, 56 S.Ct. 461, 80 L.Ed. 682 (1936).[62]

**62.** The approval of the exclusion of coerced confessions in *Jackson* was not solely because of their unreliability but was also because the manner of obtaining the confessions violated principles of Due Process. *See, Jackson v. Denno, supra,* 378 U.S., at 385–386, 84 S.Ct. 1774; *Lego v. Twomey, supra,* 404 U.S., at 485, fn. 13, 92 S.Ct. 619.

On the other hand, a number of Supreme Court and other lower court opinions recognized the possibility of excluding evidence under the Due Process Clause, but have rejected exclusion because of the particular facts presented in the case. These cases illustrate factual patterns which the Court found insufficiently egregious to warrant exclusion under Due Process.

In *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) the Supreme Court rejected the argument of the defendant that the evidence procured through the use of a paid informant should be excluded under the Due Process Clause. In that case an informant was paid by the Government to visit the defendant and report what Hoffa said and did. In rejecting the exclusion of the informant's testimony the court stated:

"This is not to say that a secret government informer is the slightest degree more free from all relevant constitutional restrictions than is any other government agent. It *is* to say that the use of secret information is not *per se* unconstitutional." *Hoffa v. United States*, 385 U.S., at 311, 87 S.Ct., at 418 [citations omitted].

The Supreme Court stated in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973):

"While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to

the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *United States v. Russell, supra*, 411 U.S., at 431–432, 93 S.Ct., at 1643.

In *Russell* a government agent supplied a chemical to the defendant which was used to manufacture an illicit drug. The Supreme Court found the Government had done nothing illegal and had not infringed Due Process.

Two recent circuit court decisions reviewed the arguments for excluding evidence based on Due Process violations. *See, United States v. Spivey*, 508 F.2d 146 (10th Cir., 1975), cert. denied, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); *United States v. DeSapio*, 435 F.2d 272 (2nd Cir., 1970). In both cases the court looked at whether the Government itself actively participated in illegal conduct and, finding that it had not, concluded that Due Process was not violated. As the court in *Spivey* stated,[63]

"There is no evidence that the government in any way directed or controlled Redman's [the informant's] activities. On the contrary, there is evidence that on earlier occasions Redman had been cautioned not to break the law.

"Our review of this testimony confirms our conclusion, that the government's conduct here does not offend the 'sense of justice' referred to in *Rochin v. California, supra*, and *Brown v. Mississippi, supra*." *United States v. Spivey, supra*, 508 F.2d, at 151.

See also, *United States v. DeSapio, supra*, 435 F.2d, at 282; *Bradford v. Johnson*, 354 F.Supp. 1331, 1334–1337 (E.D.Mich., S.D., 1972).

---

**63.** There is one more case that bears reviewing. In *Irvine v. California*, 347 U.S. 128, 74 S.Ct. 381, 98 L.Ed. 561 (1954) the Supreme Court refused to extend the *Rochin* concept of a Due Process exclusionary rule to a fact situation in which evidence was introduced that the police had entered the defendant's home without permission on a number of occasions and planted microphones. The Supreme Court in *Irvine* was split, four Justices joining in an opinion rejecting the use of *Rochin*, one Justice, Justice

Clark, concurring in the judgment only because he felt bound by the court's decision in *Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), and four Justices dissenting on the basis that the evidence must be excluded because it violated Due Process. *See, Irvine v. California, supra*, 347 U.S., at 142–149, 74 S.Ct. 381. Since *Wolf* has been overruled by *Mapp v. Ohio*, 367 U.S. 643, 654–660, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), the vitality of *Irvine* is questionable.

Synthesizing and distilling the case law discussed above, this Court concludes that Due Process requires exclusion of reliable evidence only in those cases in which government officials obtain the challenged materials in a grossly improper fashion, i. e., by engaging in illegal conduct which exhibits their knowing and purposeful *bad faith hostility* to any person's fundamental constitutional rights.[64] Therefore, under the *Janis* balance of interests test, society's interest in deterring Due Process violations outweighs society's interest in allowing the fact finder to view all relevant evidence only when an official's conduct demonstrates a bad faith hostility to the strictures imposed on him by the Constitution.[65]

**64.** Neither a technical violation of the law, nor police conduct which is entered into in good faith, but which in fact proves to be illegal would be basis for the exclusion of evidence on Due Process grounds. *See, Brown v. Illinois,* 422 U.S. 590, 607–612, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (J. Powell, concurring); *Brewer v. Williams,* 430 U.S. 387, 420–423, 97 S.Ct. 1232, 1250–1251, 51 L.Ed.2d 424 (1977) (C. J. Burger, dissenting).

**65.** There is no standing problem in this case in regard to the Fifth Amendment Due Process question. In the Fourth Amendment area, exclusion deters violations of the core Fourth Amendment interest, an individual's reasonable expectation of privacy. The Fourth Amendment expectation of privacy of a defendant such as Jack Payner was not violated by the IRS breaking and entering into Wolstencroft's briefcase and Kennedy's theft of Wolstencroft's rolodex file. In the normal case, where officers acting in *good faith*, technically violate an individual's reasonable expectation of privacy, third persons, such as Payner, are not accorded standing to exclude the fruits of the illegally obtained evidence because such third persons are not asserting an intrusion into their own expectation of privacy and the police conduct is not outrageous. In such a situation the *Janis* balance of interests test favors admissibility because no party's constitutional interest is vindicated by exclusion, and the character of the police behavior, i. e., unconscious, unintentional violation of the Fourth Amendment, cannot be deterred by exclusion. However, under the Due Process concept, the *Janis* balancing test shifts markedly in favor of extending standing to third parties, such as Payner, to raise the exclusionary rule because an element of the Due Process violation is *outrageous* official conduct which violates the constitutional rights of an individual, situated like Wolstencroft, in a fashion which is knowing, purposeful, and with a bad faith hostility toward the right violated. Such intentional bad faith conduct is as susceptible of deterrence as any crime committed purposefully by an ordinary civilian. *Compare,* the balancing approaches discussed in *Stone v. Powell,* 428 U.S. 465, 489–496, 96 S.Ct. 3037, 3049–3052, 49 L.Ed.2d 1067 (1976); *United States v. Martinez-Fuerte,* 428 U.S. 543, 554–567, 96 S.Ct. 3074, 3081–3087, 49 L.Ed.2d 1116 (1976); *United States v. Janis,* 428 U.S. 433, 453–460, 96 S.Ct. 3021, 3031–3035, 49 L.Ed.2d 1046 (1976); *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *United States v. Peltier,* 422 U.S. 531, 537–538, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975). Furthermore, in a case such as this, where the Court finds that the person who is the object of the outrageous governmental conduct, was never himself the ultimate target of the governmental investigation, then the Court must furnish those persons who are the ultimate targets with standing to raise the exclusionary rule in order to insure that some party is available to litigate the question of the Government's outrageously unconstitutional activity. Without such an expanded Due Process exclusionary rule standing theory, the Government could repeatedly commit outrageous constitutional violations with impunity against citizens, in order to obtain convictions of other citizens, so long as the government agents accept the speculative possibility of defending civil damage actions initiated by the few primary victims hardy and knowledgeable enough to file such an action. Thus, if the Court did not extend the Due Process exclusionary rule to persons situated in Payner's position, purposeful, bad faith constitutional violations by the Government might well be capable of repetition, and evade review. *See, Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 396–398, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Olmstead v. United States,* 277 U.S. 438, 485, 48 S.Ct. 564, 72 L.Ed. 944 (1927) (Mr. Justice Brandeis, dissenting); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Southern Pacific Terminal Company v. I. C. C.,* 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *United States v. W. T. Grant Company,* 345 U.S. 629, 632–633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *Compare and contrast, McNea v. Garey et al.,* 434 F.Supp. 95, 104, fn. 7 (N.D.Ohio, 1976); *United States v. Perez* (N.D.Ohio, 1977).

■ The Court finds that the illegal conduct [66] of the government officials involved in this case compels the conclusion that they knowingly and purposefully obtained the briefcase materials with *bad faith hostility* toward the strictures imposed on their activities by the Constitution.

The activities of the Government agents Jaffe and Casper [67] were outrageous. They plotted, schemed and ultimately acted in contravention of the United States Constitution and laws of Florida, knowing that their conduct was illegal.[68] It is imperative to signal all likeminded individuals that

**66.** The facts surrounding the IRS appropriation of the bank records from Wolstencroft's briefcase appear to satisfy a prima facie case of criminal larceny under Florida law. Section 812.011 of the Florida Statutes defines "property" as "anything of value, including, but not limited to real estate, tangible and intangible personal property, . . . ." Section 812.-021(1)(a) of the Florida Statutes states, "A person who, with intent unlawfully to deprive . . . the true owner of his property . . . or to appropriate the same to the use of the taker or of any other person: . . . takes from the possession of the true owner, or of any person . . . or appropriates to his own use, or that of any other than the true owner, any property" is guilty of either a misdemeanor or a felony. Significantly, the Florida courts hold that, "In order to convict a person under § 811.021, Fla.Stat., F.S.A., it is not necessary that the elements of common law larceny be proven . . . . It is enough to prove that the defendant 'secrets, withholds, or appropriates to his own use, or that of any other person, other than the true owner, . . . the property in question.' " *Thomas v. State*, 216 So.2d 780, 781 (Fla.App., 1968); *see also*, F.S.A. § 812.021(5). Certainly the list of a foreign bank's customers, which list is secret under the law of a foreign state, constitutes intangible personal property which has value. In fact Casper was paid $8,000 for that list. TRM 116. The record also clearly shows that Casper took the Castle Bank's secret customer list, an item of intangible personal property from Wolstencroft and appropriated it to his "own use or that of any other than the true owner" by selling it to the Internal Revenue Service. *See*, fn. 20, *supra*.

Jaffe's active participation in Casper's crime, as evidenced by his arranging for a place in which to photograph the Wolstencroft documents, and his appropriation of the Wolstencroft materials for his own use as well as the use of the IRS, probably renders him guilty of a Section 812.021(1)(a) violation as a principal in the first degree under F.S.A. § 777.011 which pertinently provides:

"Whoever commits any criminal offense against the state, whether felony or misdemeanor, or aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed, . . . is a principal in the first degree and may be charged, convicted and punished as such, whether he is or is not actually or construc-

tively present at the commission of such offense."
The type of conduct which the government agents exhibited in connection with the "briefcase caper" was so outrageously improper that it probably satisfies the elements of F.S.A. § 812.081 criminalizing the unauthorized appropriation of trade secrets such as secret "lists of customers," by copying such lists without permission of the owner. *See*, § 812.-081(1)(c), (3). Section 812.081 carries a different penalty than a larceny violation under Section 812.021(1)(a). *See*, Sections 812.081(2), 775.082(4)(a), 775.083(1)(d) and *contrast* those provisions with the punishment proscribed under Section 812.021(2), (3), 775.082(3)(d), 775.-083(1)(c). *See also*, fn. 75, *infra*.

The criminal activity by the government's agents in this case is particularly distressing because the briefcase information which they seized by means which were violative of Florida's criminal law, could probably have been obtained both constitutionally and without violating Florida criminal law, if the officers simply obtained a search warrant. From the record as currently constituted in this proceeding it certainly appears that the information which the IRS possessed regarding Allan Palmer's alleged use of the Castle Bank to hide—illegal income from the IRS combined with the information from Casper, clearly a reliable informant, that Wolstencroft would enter the United States with Castle Bank deposit records, might well have furnished the Government with probable cause to suspect that the records in Wolstencroft's possession constituted evidence of criminal tax evasion by some American depositors of the Castle Bank. *See*, *United States v. Manufacturers National Bank of Detroit*, 536 F.2d 699, 702–703 (6th Cir., 1976). Thus it appears likely that government officers chose to do illegally that which they could have achieved through lawful, constitutionally recognized, processes. *See* TRM 168.

**67.** As the Supreme Court has stated: "The Government cannot make such use of an informer and then claim dissociation through ignorance." *Sherman v. United States*, 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958).

**68.** Casper admitted on the witness stand that he knew he was "committing an illegal act, and [he] wanted somebody who could be trusted to keep his mouth shut about it. . . ." TRM 112–113.

purposeful criminal acts on behalf of the Government will not be tolerated in this country and that such acts shall never be allowed to bear fruit. As Mr. Justice Brandeis stated in *Olmstead v. United States*:

"Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means—to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face." *Olmstead v. United States*, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1927).

The need to deter gross illegal activity on the part of the Government, such as occurred in this case, is clear. However, the utility of the exclusionary rule in actually deterring illegal activity is often in question. *See, e. g., United States v. Janis*, 428 U.S. 433, 443–449, 96 S.Ct. 3021, 3027–3030, 49 L.Ed.2d 1046 (1976); *Stone v. Powell*, 428 U.S. 465, 496, 497, 96 S.Ct. 3037, 3052, 3053, 49 L.Ed.2d 1067 (1976) (C. J. Burger, concurring); *Brewer v. Williams*, 430 U.S. 387, 420–423, 97 S.Ct. 1232, 1250–1251, 51 L.Ed.2d 424 (1977) (C. J. Burger, dissenting).

The Court finds, from the testimony adduced at trial, that exclusion of the illegally obtained evidence in this case will have a deterrent effect. It is evident that the Government and its agents, including Richard Jaffe, were, and are, well aware that under the standing requirement of the Fourth Amendment, evidence obtained from a party pursuant to an unconstitutional search is admissible against third parties who's own privacy expectations are not subject to the search, even though the cause for the unconstitutional search was to obtain evidence incriminating those third parties.[69]

**69.** At trial the following colloqui took place between Mr. Jaffe and an attorney for the defendant:

"Q. And didn't Mr. Hyatt [a Justice Department attorney] in a memorandum to you of April, 1974, indicate that no one had standing to object legally in court to the use of the briefcase matter except Mr. Wolstencroft?

"A. The memorandum was not directed to me, sir.

"Q. Who was it directed to?

"A. I believe it was directed to his superiors in the Department of Justice.

"Q. Well, you were familiar with the contents of the memorandum?

"A. Yes.

"Q. And isn't what I said substantially the contents of the memorandum?

"A. I believe that is substantially the position he took on the memorandum, yes, sir.

"Q. In fact, wasn't there some discussion, either by written memorandum or otherwise, indicating that they were not concerned with Mr. Wolstencroft because they were only after the other people that were named in the briefcase?

"A. I don't remember any such discussion.

"Q. Well, do you remember testifying before the Rosenthal Committee; do you remember?

"A. Yes, sir.

"Q. You did testify?

"A. Yes, sir.

"Q. Do you remember in a discussion between you and Mr. Mezvinsky, in a question-and-answer session between you and Mr. Mezvinsky—and tell us whether or not this question was asked and whether this was your answer:

'Q. You have the Hyatt memo stating the activity would not be viewed as illegal or that it should not restrict your future activity, Mr. Jaffe?

'A. The context he put it was that none of the individuals on the list would have any standing to object legally in court to the use of our information.'

"A. Yes, sir.

"Q. And then do you recall this:

'The particular individual who had the briefcase might be able to assert that defense, but not the individuals themselves.'

"Do you remember that being said?

"A. Yes, sir.

■ This Court finds that, in its desire to apprehend tax evaders, a desire the

"Q. And you do remember your saying this: 'That is right. We had no interest in taking action against him.'
"A. That is true.
"Q. So you had no interest in taking action against Mr. Wolstencroft?
"A. Yes, sir.
"Q. And from what Mr. Hyatt told you, Mr. Wolstencroft was the only person who had legal standing to object to the material being taken from his briefcase?
"A. I believe he mentioned the bank also had standing.
"Q. And the bank?
"A. Yes, sir." TRM 162–165.

**70.** In the context of civil tax litigation this Court has recognized the need to permit the Internal Revenue Service wide latitude in order to thwart taxpayers from engaging in disingenuous practices that shelter income from taxation. *See, M. S. D. Incorporated et al. v. United States of America*, 434 F.Supp. 85, 92 (N.D.Ohio, March 25, 1977). However, the balance of interests shifts markedly when the Internal Revenue Service seeks judicial authorization to purposefully intrude upon the fundamental interests secured by the Constitution. In *G. M. Leasing Corporation v. United States*, 429 U.S. 338, 354–358, 97 S.Ct. 619, 629–631, 50 L.Ed.2d 530 (1977), the Government asserted that its taxing interest in conducting warrantless probable cause entries into buildings to seize property subject to tax assessments outweighed the constitutional protections secured by the Fourth Amendment. The High Court expressly rejected the Government's assertion of a constitutionally recognized tax interest which outweighed the "core" Fourth Amendment interest in premises privacy. *See, Silverman v. United States*, 365 U.S. 505, 509–512, fn. 4, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). The *G. M. Leasing* court, 429 U.S. at 354–355, 97 S.Ct., at 629–630, wrote:

"Rather, the intrusion is claimed to be justified on the ground that petitioner's assets were seizable to satisfy tax assessments. This involves nothing more than the normal enforcement of the tax laws, and we find no justification for treating petitioner differently in these circumstances simply because it is a corporation.

"The respondents [the Government] argue that there is a broad exception to the Fourth Amendment that allows warrantless intrusions into privacy in the furtherance of enforcement of the tax laws. We recognize that the 'Power to lay and collect Taxes' is a specifically enunciated power of the Federal Government, Const., Art. I, § 8, cl. 1, and that the First Congress, which proposed the adoption of the Bill of Rights, also provided

Court fully shares,[70] the Government affirmatively counsels its agents that the

that certain taxes could be 'levied by distress and sale of goods of the person or persons refusing or neglecting to pay.' Act of March 3, 1791, c. 15, § 23, 1 Stat. 204. This, however, relates to warrantless seizures rather than to warrantless searches. It is one thing to seize without a warrant property resting in an open area or seizable by levy without an intrusion into privacy, and it is quite another thing to effect a warrantless seizure of property, even that owned by a corporation, situated on private premises to which access is not otherwise available for the seizing officer.

"*Indeed, one of the primary evils intended to be eliminated by the Fourth Amendment was the massive intrusion on privacy undertaken in the collection of taxes* pursuant to general warrants and writs of assistance. As Madison argued, urging the adoption of a Bill of Rights to restrain the Federal Government:

'The General Government has a right to pass all laws which shall be necessary to collect its revenue; the means for enforcing the collection are within the direction of the Legislature: may not general warrants be considered necessary for this purpose, as well as for some purposes which it was supposed at the framing of their constitutions the State Governments had in view? If there was a reason for restraining the State Governments for exercising this power, there is like reason for restraining the Federal Government.' 1 Annals of Congress 438 (1834 ed.).

"The respondents urge that the history of the common law in England and the laws in several States prior to the adoption of the Bill of Rights support the view that the Fourth Amendment was not intended to cover intrusions into privacy in the enforcement of the tax laws. We do not find in the cited materials anything approaching *the clear evidence that would be required to create so great an exception to the Fourth Amendment's protections against warrantless intrusions into privacy.*" (emphasis added).

The *G. M. Leasing* court also noted at 358, 97 S.Ct., at 631.

". . . [W]e are unwilling to hold that the mere interest in the collection of taxes is sufficient to justify a statute declaring *per se* exempt from the warrant requirement every intrusion into privacy made in furtherance of any tax seizure."

The proposition upon which the Government acted in this case, i. e., that it could intentionally commit a flagrant Fourth Amendment violation against Wolstencroft in order to obtain convictions of third persons like Payner, is the type of purposeful evisceration of the fundamental privacy interest secured by the Consti-

Fourth Amendment standing limitation permits them to purposefully conduct an unconstitutional search and seizure of one individual in order to obtain evidence against third parties, who are the real targets of the governmental intrusion, and that the IRS agents in this case acted, and will act in the future, according to that counsel. Such governmental conduct compels the conclusion that Jaffe and Casper transacted the "briefcase caper[71]" with a purposeful, bad faith hostility toward the Fourth Amendment rights of Wolstencroft in order to obtain evidence against persons like Payner. That outrageous behavior on the part of the Government infringes Payner's Due Process rights, and can only be deterred by granting Payner's motion to suppress.

For this reason, the Court holds that the evidence against Payner, which is the fruit of the outrageously illegal seizure directed at Wolstencroft's briefcase, must be suppressed under the Due Process Clause of the Fifth Amendment to the United States Constitution.

### Supervisory Power[72]

Above and beyond the constitutional requirement of Due Process, the federal judiciary has the duty of supervising the administration of criminal justice in federal courts. This duty requires the federal judiciary to take actions and make decisions which will further the ends of justice. In this regard the Supreme Court wrote:

"It is true, as the petitioners assert, that a conviction in the federal courts, the foundation of which is evidence obtained in disregard of liberties deemed fundamental by the Constitution, cannot stand. . . . Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as 'due process of law' and below which we reach what is really trial by force." *McNabb v. United States*, 318 U.S. 332, 339–340, 63 S.Ct. 608, 612, 87 L.Ed. 819 (1943).

*See also, Upshaw v. United States*, 335 U.S. 410, 412–414, 69 S.Ct. 170, 93 L.Ed. 100 (1948); *Mallory v. United States*, 354 U.S. 449, 452–453, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); *Elkins v. United States*, 364 U.S. 206, 216, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Nardone v. United States*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1937); *Benanti v. United States*, 355 U.S. 96, 99–103, 78 S.Ct. 155, 2 L.Ed.2d 126 (1957); *Mesarosh v. United States*, 352 U.S. 1, 9–14, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *Lopez v. United States*, 373 U.S. 427, 440, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Ker v. California*, 374 U.S. 23, 31–32, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); *Communist Party v. Subversive Activities Con. Bd.*, 351 U.S. 115, 124, 76 S.Ct. 663, 100 L.Ed. 1003 (1956); *United States v. Valencia*, 541 F.2d 618, 621–622 (6th Cir.,

tution which, the *G. M. Leasing* court concluded, is not sufficiently justified by the Government's need to enforce the tax laws.

**71.** Casper himself refers to the Wolstencroft incident on January 15, 1973 as the "briefcase caper." TRM 117 (emphasis added).

**72.** The Court is well aware of the long established doctrine that constitutional questions will be avoided when an alternate means can be employed to the same effect. *Burton v. United States*, 196 U.S. 283, 295, 25 S.Ct. 243, 245, 49 L.Ed. 482 (1904) ["It is not the habit of

the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.] *See, e. g., Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936). In this case the court holds that exclusion is required under Due Process and supervisory powers. The court deals with Due Process because the Government might well argue that supervisory power to exclude is limited to these instances specified under the federal criminal rules. Therefore, the court sets forth the Due Process basis for exclusion.

1976); *Williamson v. United States*, 311 F.2d 441, 444 (5th Cir., 1962).[73]

 The Court concludes from a review of the cases cited above, that the federal courts' supervisory power over federal prosecutions should be invoked to exclude[74] evidence obtained by Governmental conduct which is either purposefully illegal[75] or motivated by an intentional bad

**73.** In *Communist Party v. Subversive Activities Con. Bd.*, the Supreme Court stated:

"The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our prudent boasts. This court is charged with supervisory functions in relation to proceedings in federal courts. . . . Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted." *Communist Party, supra*, 351 U.S., at 124, 76 S.Ct., at 668. *See also, Mesarosh, supra*, 352 U.S., at 14, 77 S.Ct., at 8.

**74.** As discussed in regard to the Due Process exclusionary rule, exclusion on the basis of supervisory power is only done as a last resort.

"The function of a criminal trial is to seek out and determine the truth or falsity of the charges brought against the defendant. Proper fulfillment of this function requires that, constitutional limitations aside, all relevant, competent evidence be admissible, unless the manner in which it has been obtained—for example, by violating some statute or rule of procedure—compels the formulation of a rule excluding its introduction in a federal court." *Lopez v. United States*, 373 U.S. 427, 440, 83 S.Ct. 1381, 1388, 10 L.Ed.2d 462.

**75.** *See, e. g., Nardone v. United States, supra*, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 (1939); *Benanti v. United States, supra*, 355 U.S. 99–103, 78 S.Ct. 155; *Williamson v. United States, supra*, 311 F.2d, at 444 [". . . It becomes the duty of the courts in federal criminal cases to require fair and lawful conduct from federal agents in the furnishing of evidence of crimes."]; *Rea v. United States*, 350 U.S. 214, 216–218, 76 S.Ct. 292, 100 L.Ed. 233 (1956); *Wise v. Henkel*, 220 U.S. 556, 558, 31 S.Ct. 599, 55 L.Ed. 581 (1911).

Exclusion under the Fifth Amendment Due Process Clause and federal courts' supervisory power is particularly important where *federal* officers are counseled to gather evidence in a fashion which violates the criminal law of a state and they purposefully violate such criminal laws in reliance on the erroneous counsel that their conduct is authorized by federal power. If such officers can demonstrate a subjective belief that their "conduct was necessary and proper under the circumstances," then they are immune from state prosecution, regardless of how flagrantly their actions violate a state's criminal law. *See, Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir., 1977), a case in which, under the Supremacy Clause of the United States Constitution, a federal officer who shot and killed an unarmed fleeing suspect in the back during a raid on an illegal drug factory was granted a post indictment, pretrial, writ of habeas corpus blocking his prosecution in state court for second degree murder and involuntary manslaughter. *Compare, Ex Parte Neagle*, 135 U.S. 1, 75, 10 S.Ct. 658, 34 L.Ed. 55 (1890). In the case of *In Re Lewis*, 83 F. 159 (D.Wash., 1897) the court, applying the *Neagle* doctrine, granted a writ of habeas corpus blocking a state robbery prosecution of special employees of the United States Treasury Department and a United States Deputy Marshal who *wrongfully* seized private papers while executing a search warrant. The *Lewis* court observed at 160,

"In deciding this case, I do not mean to say that the warrant which Mr. Kiefer issued was a lawful warrant, nor that the proceedings under it were proper proceedings. I do not mean to say that the petitioners were lawfully discharging their official duties in what they did. In my opinion, the warrant itself was improvidently and erroneously issued, and the proceedings were all ill-advised, and conducted with bad judgment. But where an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and invades the rights of individuals, he is answerable to the government or power under whose appointment he is acting, and may also lay himself liable to answer to a private individual who is injured or oppressed by his action; yet where there in no criminal intent on his part he does not become liable to answer to the criminal process of a different government. With our complex system of government, state and national, we would be in an intolerable condition if the state could put in force its criminal laws to discipline United States officers for the manner in which they discharge their duties."

Evidently, the Supremacy Clause furnishes *federal* officers a broad, although perhaps not absolute, *see, United States ex rel. Drury v. Lewis*, 200 U.S. 1, 8, 26 S.Ct. 229, 50 L.Ed. 343 (1906), protection against state criminal prosecution when they violate state criminal laws while performing their federal duties. The existence of such official immunity for federal officers means that the deterrent effect of state criminal punishment for criminal conduct in their collection of evidence approaches zero.

faith hostility to a constitutional right.[76] Put in terms of the *Janis* balancing test, only when the Government's procedure in obtaining evidence is purposefully illegal or the procedure is a knowing and purposeful act, performed with a bad faith hostility to an individual's constitutional right,[77] does society's interest in deterring such conduct by exclusion outweigh society's interest in furnishing the trier of fact with all relevant evidence.

■ The Court finds the Government's action in this case was both purposefully illegal [78] and an intentional, bad faith act of hostility directed at Wolstencroft's reasonable expectation or privacy.[79] The Court therefore finds that the evidence obtained by the Government as a result of the seizure of Wolstencroft's briefcase must be excluded under this Court's supervisory function.

### Evidence Excluded

■ The remaining aspect of the case requires this Court to determine what evidence introduced by the Government against Jack Payner must be excluded. The question was phrased by the Supreme Court as follows:

Absent the deterrent effect of state criminal prosecution, the only practical deterrent to federal officers adopting means of federal law enforcement which are criminal under state law, is often the deterrence generated by federal court suppression of the fruits of federal officials' criminal investigative techniques. The Fifth Amendment Due Process and Supervisory Power concepts, in conjunction with the speculative possibility of civil damage judgments, are certainly appropriate instruments for administering an adequate dose of deterrence, while at the same time preserving an adequate level of criminal immunity for federal officials.

Of course 18 U.S.C. § 2236(b) poses none of the deterrence effected by state criminal law against purposefully improper conduct by federal officials when they act on "reasonable grounds" to suspect the person searched committed a felony. Likewise 18 U.S.C. § 241 furnishes no deterrence to purposefully unconstitutional conduct by federal officers when the person who suffers an intrusion into his reasonable expectation of privacy is not a "citizen" (perhaps Wolstencroft is not a citizen) or the federal officers do not "go in disguise on the highway or on the premises of [the person who's rights are violated]."

Therefore, the deterrence rationale for exclusion under either the Fifth Amendment Due Process Clause of Federal Supervisory Power is uniquely compelling when a federal court is presented with evidence which federal officers clearly obtained through their active, affirmative participation in conduct which is criminal under state law, regardless of the Fourth Amendment standing considerations. As the Court discussed above, this is precisely such a case. *See*, fns. 65 and 66, *supra*.

76. *Elkins v. United States, supra*, 364 U.S., at 216–217, 80 S.Ct. 1437; *United States v. Valencia, supra*, 541 F.2d, at 621–622. The need to deter government agents' purposeful hostility to individuals' constitutional rights is analogous to the policy rationale for excluding evidence seized in "pretext" searches. *See, South*

*Dakota v. Opperman*, 428 U.S. 364, 382, 96 S.Ct. 3092, 3103, 49 L.Ed.2d 1000 (1976) (Mr. Justice Powell, concurring); *Amador-Gonzalez v. United States*, 391 F.2d 308, 313–315 (5th Cir., 1968); *Taglavore v. United States*, 291 F.2d 262, 265–267 (9th Cir., 1961); *McKnight v. United States*, 87 U.S.App.D.C. 151, 183 F.2d 977, 978 (1950); *Blazak v. Eyman*, 339 F.Supp. 40, 42–43 (D.Ariz., 1971); *United States v. Carriger*, 541 F.2d 545, 553 (6th Cir., 1976); *United States v. Robinson*, 414 U.S. 218, 246–248, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (Mr. Justice Marshall, dissenting); *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 76 L.Ed. 877 (1932); *Abel v. United States*, 362 U.S. 217, 226, 230, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); *United States v. Perez*, Case No. CR76–346, Slip Op., p. 21, fn. 40 (N.D.Ohio, April 21, 1977); *City of Cleveland v. Tedor*, Case No. 34622, Slip Op., pp. 3–5 (Cuyahoga County Ohio Court of Appeals, March 4, 1976).

77. The standing problems associated with the Fourth Amendment exclusionary rule, *see*, fn. 65, *supra*, are not present in regard to exclusion under supervisory power. *See, United States v. Valencia, supra*, 541 F.2d at 621–622. Exclusion under supervisory power maintains the integrity of the federal system and deters illegal and unconstitutional police activity. These interests are the directing issue in this case. This is not a case where exclusion is invoked solely to vindicate a technically invalid intrusion into Wolstencroft's expectation of privacy. The decision of whether to exclude or not is made by reference to the *Janis* balance of interests test, which test takes into account the standing question.

78. *See*, fn. 66, *supra*.

79. The Court made a finding that the government agents knew they were committing an unconstitutional search.

**136**

"Whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Alderman v. United States*, 394 U.S. 165, 180–181, 89 S.Ct. 961, 970, 22 L.Ed.2d 176 (1969), citing *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

The Government has the burden to show that its evidence is untainted by the illegal search. *See, Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176. It may do this in two ways: by proving that the evidence was obtained independent of the search, *see, e. g., Silverthorne Lumber v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Alderman v. United States, supra*, 394 U.S., at 183, 89 S.Ct. 961 (1969); or by demonstrating that the information which led to the discovery of the evidence is so far removed from the illegally seized evidence that the connection became "so attenuated as to dissipate the taint." *Nardone v. United States, supra*, 308 U.S., at 341, 60 S.Ct., at 268; *see also, Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Brown v. Illinois*, 422 U.S. 590, 598, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975).

The Government argues that the guarantee, Exhibit 4, was the product of an independent investigation and that all information derived from the guarantee is free of taint.[80] However, this Court has concluded, *see,* page 122 of this opinion, that the discovery of the guarantee was directly related to the information obtained from Wolstencroft's briefcase. The Court holds that the guarantee and the evidence its discovery subsequently produced were "come at by the exploitation" of the Government's illegal action in searching and seizing Wolstencroft's briefcase.[81]

The Court therefore excludes[82] all evidence introduced in the case by the Government with the exception of Jack Payner's 1972 tax return, Exhibit 1, and the related testimony.[83]

IT IS SO ORDERED.

**80.** *See,* Government Memorandum of March 15, 1977.

**81.** The Court notes that the Government did not argue that the guarantee, or the information discovered after the guarantee was found, was "so attenuated as to dissipate the taint." Nevertheless, the Court holds that the taint is not attenuated. *See, Wong Sun v. United States, supra,* 371 U.S., at 487–488, 83 S.Ct. 407.

**82.** As Justice Holmes stated:
"The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed." *Silverthorne Lumber Co. v. United States, supra,* 251 U.S., at 392, 40 S.Ct., at 183. *See also, Wong Sun v. United States, supra,* 371 U.S., at 416, 83 S.Ct. 407 (quoted with approval).

**83.** The exclusion includes the testimony of all the Government's witnesses as it relates to information discovered as a result of the guarantee, notably the testimony of Robert Mintz, Mary Rhodenizer, Samuel Pierson, Carl Brownell, Jr., William Losner, and Susie Vrabel.